SLIP OPINION

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-13-224

| | | |
|---|---|---|
| CATHERINE CHESTER | | **Opinion Delivered** October 9, 2013 |
| | APPELLANT | |
| V. | | APPEAL FROM THE HOT SPRING COUNTY CIRCUIT COURT [NO. 30DR-2010316-2] |
| KEVIN PILCHER | | HONORABLE ED M. KOON, JUDGE |
| | APPELLEE | |
| | | AFFIRMED |

## ROBIN F. WYNNE, Judge

Catherine Chester appeals from the circuit court's order regarding Kevin Pilcher's visitation with their two minor children. She argues on appeal that Kevin failed to show a material change in circumstances, that she did show a material change in circumstances, and that even if there had been a material change in Kevin's favor, increased visitation was not in the children's best interest. We affirm.

The parties, who were never married, have two children—J.P. (born 9/29/2008) and D.C. (born 4/16/2010). On September 21, 2010, after an order of protection had been entered in a separate case, Catherine filed a petition for child custody, child support, and visitation in the domestic-relations division of the Hot Spring County Circuit Court. She sought an adjudication of paternity, continued child support, and supervised visitation for Kevin. Kevin responded, pointing out that J.P. already received monthly Social Security

SLIP OPINION

benefits in the amount of $420 as a result of Kevin's disability and arguing that he was a suitable parent entitled to normal and regular visitation.

On December 15, 2010, the court held a hearing on the motion. The court awarded custody of J.P. and D.C. to Catherine and set out a visitation schedule for Kevin, under which visitation would gradually increase as the children got older.[1] The court also ordered that the full amount of each child's benefits received due to Kevin's disability should be paid to Catherine in fulfillment of Kevin's duty to pay child support. The court's rulings included the following:

> The Court finds that the Defendant, Kevin Pilcher, shall have visitation with J.P. every other Saturday from 9:00 a.m. to 5:00 p.m. and every other Sunday from 9:00 a.m. to 5:00 p.m. until he turns 3 years old. At that time the Defendant shall have visitation every other Saturday at 9:00 a.m. until Sunday at 5:00 p.m. When J.P. turns 4 years old, Defendant shall have visitation every other weekend from 5:00 p.m. Friday to 5:00 p.m. Sunday.

> The Defendant shall have two non-consecutive weeks of Summer visitation when J.P. is 3 years old. When he turns 4, Defendant shall have three non-consecutive weeks. When he turns 5, Defendant shall have four weeks, but no more than two consecutive weeks at a time unless the parties agree otherwise.

> The Defendant shall have visitation with D.C. every Saturday for two hours and every Sunday for two hours. When D.C. turns 1 year old, Defendant shall have every other Saturday and Sunday from 9:00 a.m. to 5:00 p.m. When D.C. turns 2, the Defendant shall have the same visitation guidelines for J.P. as set out above.

In August 2012, Catherine filed a motion for modification of visitation. She argued that Kevin's visitation should be suspended based on the following changes in circumstance:

> the Department of Human Services is currently conducting an investigation regarding alleged sexual abuse of the children; the Plaintiff fears that the children have been sexually abused at a time when the Defendant had visitation; that the Defendant lives

---

[1]The circuit court's rulings were not reduced to a written order until November 6, 2012, at which point a different judge was presiding over the case.

with his sister, Amanda Lewis; that Amanda Lewis' children have been allegedly removed from her custody due to abuse at her hands; that the Defendant is romantically involved with Verona Pilcher in the presence of the children; that the Defendant is allowing multiple males to reside in the home; that the mobile home that the Defendant lives in has subfloor with no covering due to dog urine ruining the carpet and is filthy and is littered with open alcoholic beverage containers despite a direct order from this Court to keep the home clean and not use alcohol in the children's presence; the children have no beds at the Defendant's home; that the Defendant continues to have pit bull dogs despite a direct order from this Court not to; when the Defendant returns the children to the Plaintiff they are unkempt and in urine soaked clothing and diapers despite the Plaintiff providing the Defendant with diapers multiple times; the children have come back home ill on several occasions; the Defendant refuses to follow Doctor's orders, including not withholding soda and solid foods following a yeast infection and removal of tonsils because he says, "all doctors are quacks"; the Defendant refuses to use a car seat to transport the children despite the Plaintiff loaning him a car seat multiple times; the Defendant transports the children in a car that is unsafe; the Defendant teaches the children to punch, hit and be disrespectful and return cussing; the Defendant uses the F-word in the children's presence and calls the minor child Fat A★★; the Defendant admitted to the Plaintiff that he tested positive for THC on a recent drug test conducted by DHS; among other issues and facts.

Catherine asked that Kevin's visitation be suspended until the DHS investigation was complete and until he proved that his home was safe and suitable and that he was drug-free. Kevin responded to the motion for modification of visitation and included a countermotion for contempt. He denied Catherine's allegations and asked the court to hold her in contempt for violating the court's ruling by suspending his visitation privileges. He amended his motion for contempt to include the allegation that Catherine had filed a false report against him with DHS and asked that the court grant him visitation with both children "at the same time rather than the graduated visitation schedule as ordered in the hearing" in December 2010.

On November 27, 2012, the court held a hearing on Catherine's motion for modification of visitation and Kevin's countermotion for contempt. At that time, the

children were four and two-and-a-half years old. Catherine testified that the children had last seen their father on June 24, 2012. After that visit, she suspected that D.C. had been sexually abused; she took him to a hospital for examination, the police were contacted, and Catherine suspended visitation and contacted DHS. She later suspected that J.P. had also been sexually abused. Catherine testified that she had other concerns about the visitations, including the following health concerns: the children being exposed to cigarette smoke despite D.C. having bronchitis; J.P. coming home having had only an apple and some crackers to eat all day; consistently feeding the children non-nutritious food; feeding J.P. hard cookies the day after having his tonsils removed; and refusing to follow the doctor's orders that J.P. should only be allowed to drink milk or water for three months due to a yeast infection of his esophagus.

In addition, Catherine testified that Kevin had people living in his home that caused her concern. She stated that Jimmy Dyer, who was an alcoholic and illegal-drug user, was living there, as was Amanda Lewis, who had been arrested for prostitution. Catherine objected to him living with someone with whom he was romantically involved but not married to. In addition, she testified that another man lived in the mobile home, as did Debbie Griger and her husband and three children. Catherine stated that "it's whoever has money comes to stay there." Catherine also asserted that the home and yard were not clean. She submitted pictures of the outside of the home, with trash in the yard and beer cans on the porch, which she said she had taken in October 2011. Additional pictures showed the cracked windshield of a truck that Catherine alleged Kevin had been driving the children in, a pit bull chained in the yard, and a child's cup that had mold floating in it. Catherine

testified regarding the conditions inside the mobile home. She also testified that the children were coming home dirty and sick after visiting their father; after the visits had stopped, the children were not getting sick. She testified that the children were misbehaving and using profanity after coming home from their father's house; she offered several pages from Kevin's Facebook page in which he had posted profanity-laden comments, some about Catherine, and a similarly profanity-laden recording of a message Kevin had left on her phone. On cross-examination, Catherine acknowledged that she had not seen Kevin's home since June.

Kevin's cousin, Debbie Griger, testified that she had signed an affidavit on October 30, 2012, about the condition of Kevin's three-bedroom, two-bath mobile home. She stated that the home had been full of bed bugs and roaches when she and her family lived with Kevin, but they moved out in September 2012 and she believed that he had since taken care of it.

Catherine's husband, David Chester, testified that he and Catherine married in 1992 and had two children together, who were now seventeen and nearly fifteen. After about twelve years of marriage, they divorced and were apart for about five years, but they had remarried in August 2012. His biggest concern with his stepchildren was that J.P. was acting inappropriately in a sexual way at the age of three. These incidents happened three or four times, toward the end of the visits with their father. Other concerns included that the children were sick a lot, that they used inappropriate language, and that they were aggressive—hitting, screaming, and yelling were the main ways they communicated.



Catherine's father, David Overturf, also testified that, upon coming home from visiting their father, the children were violent and used bad language, including calling their mother bad names.

Kevin testified that his little sister Rachel and his nephew lived with him at the time of the hearing. He stated that he had a lot of close friends come over to visit, sometimes staying the night or spending short periods of time there. Kevin testified that he did not think it would matter because he did not get much visitation. He explained why the trash was in his yard and testified that he had hauled it away nearly two years before. Kevin testified that he had not had any alcohol in his house since his father died nearly three years before. He denied telling Catherine that he had tested positive for THC. Kevin introduced documentation from the Arkansas State Police Crimes Against Children Division. The first (dated August 6, 2012) was a notice that the allegation of sexual abuse of D.C. involving Kevin, which was reported on June 29, 2012, was unsubstantiated. The second (dated September 6, 2012) was a notice that the allegation of sexual abuse of J.P. involving Kevin, which was reported on August 6, 2012, was unsubstantiated.

In an order entered December 3, 2012, the court denied Catherine's motion to modify visitation, found her in contempt for violating the visitation order but did not issue any punishment, granted Kevin visitation with both children from 5:00 p.m. Friday to 5:00 p.m. Sunday every other weekend beginning November 30, 2012, enjoined the parties from saying anything negative about each other in the children's presence, granted Kevin one extra weekend of visitation a month from December 2012 to May 2013, and changed D.C.'s surname to Pilcher. On December 17, 2012, the court entered an amended order regarding

SLIP OPINION

the initial custody and visitation determination; the only change from the order entered on November 6, 2012, was a correction of the date of the initial hearing to reflect the correct date of December 15, 2010.

Catherine filed a notice of appeal from the December 3 order on December 20, 2012. She filed an amended notice of appeal on January 8, 2013, stating that she was appealing both the December 3 and December 17 orders of the court.

Our supreme court recently set out the standard of review applicable to child-visitation cases:

> In reviewing domestic-relations cases, appellate courts consider the evidence de novo. We will not reverse the circuit court's findings unless they are clearly erroneous. When the question of whether the circuit court's findings are clearly erroneous turns largely on the credibility of the witnesses, we give special deference to the superior position of the circuit court to evaluate the witnesses, their testimony, and the child's best interest.

> A circuit court maintains continuing jurisdiction over visitation and may modify or vacate those orders at any time when it becomes aware of a change in circumstances or facts not known to it at the time of the initial order. Although visitation is always modifiable, to promote stability and continuity for the children and to discourage repeated litigation of the same issues, courts require more rigid standards for modification than for initial determinations. Thus, the party seeking a change in visitation has the burden to demonstrate a material change in circumstances that warrants such a change.

> The primary consideration regarding visitation is the best interest of the child. Important factors the court considers in determining reasonable visitation are the wishes of the child, the capacity of the party desiring visitation to supervise and care for the child, problems of transportation and prior conduct in abusing visitation, the work schedule or stability of the parties, and the relationship with siblings and other relatives. Fixing visitation rights is a matter that lies within the sound discretion of the circuit court.

*Brown v. Brown*, 2012 Ark. 89, at 6–7, 387 S.W.3d 159, 163 (quoting *Baber v. Baber*, 2011 Ark. 40, at 9–10, 378 S.W.3d 699, 705) (internal citations omitted).



I. *Material Change in Circumstances*

Catherine argues on appeal that the trial court clearly erred in modifying visitation in Kevin's favor. Catherine contends that Kevin failed to show a material change in circumstances and that she did show a material change in circumstances warranting a *decrease* in visitation. Catherine believes that the trial court's order increased Kevin's visitation with D.C.; however, Catherine errs in assuming that the court increased Kevin's visitation.

In its ruling from the bench, the trial court made it clear that Kevin would "resume the visitation schedules with both children as set out in the Order that was entered pursuant to the December 15, 2012 hearing." The pertinent part of the trial court's December 2010 ruling provides, after setting out the above-referenced graduated visitation schedule for J.P.:

> The Defendant shall have visitation with D.C. every Saturday for two hours and every Sunday for two hours. When D.C. turns 1 year old, Defendant shall have every other Saturday and Sunday from 9:00 a.m. to 5:00 p.m. When D.C. turns 2, the Defendant shall have the same visitation guidelines for J.P. as set out above.

The trial court interpreted this order to mean that, at the age of two, D.C. would have the same visitation as his older brother J.P. As a general rule, judgments are construed like any other instruments; the determinative factor is the intention of the court, as gathered from the judgment itself and the record. *Magness v. McEntire*, 305 Ark. 503, 506, 808 S.W.2d 783, 784 (1991). From our review of the language in the initial visitation-and-custody order, we cannot say that the trial court misconstrued that order.

The extra weekend visitation that the court granted Kevin from December 2012 to May 2013 is irrelevant for our purposes because it has already taken place. Therefore, whether the trial court erred in granting that visitation is moot. Our supreme court has explained:

As a general rule, the appellate courts of this state will not review issues that are moot. *See Cotten v. Fooks*, 346 Ark. 130, 55 S.W.3d 290 (2001). To do so would be to render advisory opinions, which this court will not do. *See id*. We have generally held that a case becomes moot when any judgment rendered would have no practical legal effect upon a then-existing legal controversy. *See id*. In other words, a moot case presents no justiciable issue for determination by the court. *See Shipp v. Franklin*, 370 Ark. 262, 258 S.W.3d 744 (2007).

. . . .

That being said, we have recognized two exceptions to the mootness doctrine, one of which involves issues that are capable of repetition, yet evade review. *See Honeycutt v. Foster*, 371 Ark. 545, 268 S.W.3d 875 (2007). The other mootness exception concerns issues that raise considerations of substantial public interest which, if addressed, would prevent future litigation. *See id*.

*Terry v. White*, 374 Ark. 387, 391–93, 288 S.W.3d 199, 202–03 (2008). Neither exception to the mootness doctrine applies in the present case. In summary, there was no modification of the initial visitation order, and appellant's argument that Kevin failed to show a material change in circumstances has no merit.

Catherine's argument that the trial court clearly erred in not modifying visitation to decrease Kevin's visitation also fails. The trial court weighed the evidence that Catherine presented and found that "few, if any, of the allegations that [Catherine] has made are substantiated by the evidence." The court went on to state that the best evidence before the court on the sexual-abuse allegations—DHS's investigation—was that they were unfounded. The court did not credit Catherine's assertions that the children's illnesses or aggressive behavior could be attributed to Kevin. In sum, the trial court weighed the evidence and assessed the credibility of the witnesses, and this court defers to the trial court on those matters. Therefore, we affirm on this point.



II.  *Best Interest*

Next, Catherine argues that even if there had been a material change in circumstances favorable for Kevin, increasing visitation was not in the children's best interest.  Essentially, while acknowledging that there are no "magic words" that the circuit court was required to use, she argues that the trial court failed to consider the best interest of the children in modifying the visitation schedule. As noted above, the trial court did not modify the visitation schedule.  Furthermore, we are not convinced that the trial court failed to consider the best interest of the children.

Affirmed.

HARRISON and BROWN, JJ., agree.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*; and *Sherry Burnett*, for appellant.

*Willie E. Perkins, Jr.*, for appellee.